FILED
09/23/2024
Tina Henry
CLERK
Cascade County District Court
STATE OF MONTANA
By: Elizabeth Sweeney
DV-7-2024-0000248-NE
Kutzman, John A.
3.00

Mark M. Kovacich
Ben A. Snipes
Ross T. Johnson
KOVACICH SNIPES JOHNSON, PC
P. O. Box 2325
Great Falls, MT 59403
(406) 500-5000

Attorneys for Plaintiff

MONTANA EIGHTH JUDICIAL DISTRICT COURT, CASCADE COUNTY

| | |
|---|---|
| IRA A. TROYER,<br><br>            Plaintiff,<br><br>v.<br><br>MARYLAND CASUALTY COMPANY,<br>and Does A-Z, inclusive.<br><br>            Defendants. | CAUSE NO. DV-7-2024-0000248-NE<br><br>**AMENDED COMPLAINT AND JURY DEMAND** |

COMES NOW Plaintiff, demanding trial by jury, and for his complaint against the above named Defendants alleges:

## **PARTIES**

1.

Plaintiff is a citizen and resident of Montana.

2.

Defendant Maryland Casualty Company ("MCC") is a for profit insurance company with its principal place of business in Maryland, but at all times relevant hereto, doing business in the State of Montana.

3.

The true names and capacities of the Defendants named herein as Does A - Z, inclusive, are unknown to Plaintiff at this time, who therefore bring this action against said Defendants by fictitious name. Plaintiff will seek leave to amend this complaint to state the true names and capacities of Defendants Does A - Z when the same have been ascertained, together with further appropriate charging allegations. Plaintiff is informed, believes, and thereon alleges that each fictitiously named Defendant may be legally responsible in some manner for the occurrences alleged herein and that Plaintiff's damages as alleged herein may have been proximately caused in part by said Defendants' unlawful acts or omissions.

## JURISDICTION

4.

This court has original and subject matter jurisdiction over this action and personal jurisdiction over each of the parties.

## GENERAL ALLEGATIONS

5.

Asbestos is a deadly substance consisting of tiny needle like fibers that easily penetrate and lodge in the linings of lungs. Human lungs are unable to remove asbestos speared into lung tissue. The asbestos spears cannot be washed out of lung tissues by blood. Affected lung areas become inflamed, in time heavily scarred, and ultimately nonfunctional. For one with this disease process, it becomes increasingly more difficult to breathe. Ultimately, the person suffocates.

6.

The sinister effects of asbestos exposure are compounded by the fact that diseases caused by asbestos have long latency periods. It is not uncommon for persons to be first diagnosed with potentially fatal diseases many years following their initial exposure to asbestos.

7.

At all times relevant to this action, Defendants had actual knowledge that asbestos is an extremely hazardous substance and that exposure to asbestos causes potentially fatal diseases, including asbestosis and lung cancer.

8.

After the deadly asbestos contaminated vermiculite was processed into manufactured products, the wood product company Defendants used and re-sold the product at lumber mills in Libby, Montana.

9.

MCC provided professional industrial hygiene services to address the safety of the mine and mill work site through what were represented to be competent Safety Engineers and professionals from the Engineering Division and the Medical Division of MCC, under the supervision of industrial hygienist L.E. Park.

10.

As a result of Defendants' negligent acts and omissions as herein alleged, Ira Troyer developed bilateral asbestosis.

## FIRST CAUSE OF ACTION

### (Negligence in Provision of Industrial Hygiene Services v. Maryland Casualty Company)

11.

Paragraphs 1-10 above are incorporated by this reference.

12.

MCC provided professional industrial hygiene services to address the safety of the mine and mill work site through what were represented to be competent Safety Engineers and professionals from the Engineering Division and the Medical Division of MCC, under the supervision of industrial hygienist L.E. Park.

13.

From its first undertaking at the Mine facility, Park and others in the Accident Prevention Department at MCC knew that they "had an outstanding pneumoconiosis occupational disease exposure," and "soon learned that there were 30 employees who lacked normal lung function."

14.

MCC knew that the 1959 series of chest x-rays on the Libby workers showed a one-third incidence of abnormal chest x-rays.

15.

MCC knew that the 1964-1973 annual series of chest x-rays on the Libby workers showed a 25% plus incidence of abnormal chest x-rays.

16.

MCC knew that a 1965 study showed 20% incidence of asbestosis in the Libby workers, with a likely incidence of twice that upon thorough testing.

17.

MCC knew or should have known that from 1961 forward, men were dying of asbestos disease, and that each year more became diseased.

18.

MCC knew or should have known that there were no showers for workers, no coveralls for workers, and that workers went home and into the community covered with asbestos dust, which was hazardous to all those who might come into contact with it.

19.

As part of its industrial hygiene services, MCC's Engineering Division and Medical Division undertook to "engineer this risk," and undertook to design a "program for control and prevention" of asbestos dust and disease for the benefit of workers that would address dust control and personal protection from asbestos dust.

20.

In its provision of industrial hygiene services and its undertaking of industrial hygiene measures, MCC had a duty of reasonable care to its workers, including Ira Troyer, who were relying on the fulfillment of safe standards of industrial hygiene, and to those who were in need of disclosure of the nature and degree of the asbestos hazard known to MCC.

21.

MCC was negligent in their design of the industrial hygiene program, and in failing to disclose and disseminate, to the workers and individuals at risk, the nature and degree of the asbestos hazard MCC had acquired and analyzed by its industrial hygiene professionals. MCC was negligent:

(a) in failing to include sufficient measures for education of workers, in the hazards of asbestos exposure;

(b) in failing to include measures to warn workers of the hazards of asbestos exposure;

(c) in failing to include sufficient measures and standards for dust control through housekeeping, ventilation and exhaust air cleaning;

(d) in failing to include sufficient measures and standards for maintenance of equipment and premises;

(e) in failing to include a sufficient medical monitoring program;

(f) in failing to disclose the nature and degree of the immediate and extreme asbestos hazard known to the professionals at MCC;

(g) in failing to sufficiently test and monitor the effectiveness of dust control at all locations where there was dust;

(h) in failing to obtain available medical information on the incidence of disease and deaths at the W.R. Grace & Co. Libby operations including from public agencies; and

(I) in failing to sufficiently study and use the information on dust control and asbestos disease that it did have.

22.

MCC undertook to address industrial hygiene concerns including prescription of warnings and worker education of the asbestos hazard for the mine and mill workers.

23.

MCC had a duty of care to the mine and mill workers to assure that warnings were designed to reasonably inform those at risk:

(a) of the level of asbestos in the workplace;

(b) of the hazards of asbestos carried home on workers' clothes;

(c) of the toxicity of the asbestos and nature and degree of the health hazard and deadly health effects of asbestos inhalation;

(d) of the hidden nature of the hazard, that its deadly effects operated invisibly and without obvious signs of irritation or harm, and that its latent deadly effects would first manifest many years after what would, to the uneducated layman, would be an apparent innocuous exposure to harmless dust; and

(e) of the means to limit exposure in the workplace and at home, such as changing and washing procedures that kept work clothes out of the home, and training on where, when and what type of respirator devices needed to be worn to keep the worker safe.

24.

As part of its industrial hygiene services and the creation of a program for control and prevention of asbestos disease, MCC failed to design and prescribe the necessary warnings.

25.

MCC was negligent in their design of the warning and education aspects of the safety program in that it failed:

(a) to include sufficient measures for education of workers, in the hazards of asbestos exposure;

(b) to include sufficient measures for apprising the workers of the high levels of asbestos dust at the worksite;

(c) to include sufficient warnings and measures to apprise workers of consequences of unprotected exposure to asbestos dust at levels regularly encountered in the workplace;

(d) to include sufficient measures to warn and apprise workers of the dangers of transporting work clothes to their homes; and

(e) to include warnings and measures to warn workers of the hazards of asbestos exposure in a manner that met industrial hygiene standards for warnings of a hidden and deadly hazard.

26.

MCC's representatives with expertise in industrial hygiene inspected the W.R. Grace & Co. Libby operations.

27.

In so doing, MCC had a duty of reasonable care to the Libby workers, including Ira Troyer.

28.

MCC was negligent in its inspection of the W.R. Grace & Co. Libby operations, in failing to disclose to workers the nature and degree of the hazard and in failing to act upon known hazardous conditions due to insufficient worker education, insufficient warnings to workers, insufficient dust control (including housekeeping, ventilation, exhaust air cleaning and maintenance), and insufficient medical monitoring.

29.

Plaintiff worked at the vermiculite mine and mill in the Libby area and/or lived or recreated in the Libby area and was exposed to and inhaled asbestos dust from the mill operations.

30.

Workers had no coveralls and no showers. As a result, workers including Plaintiff went home with asbestos dust on their clothing and in their cars, thereby contaminating their homes with asbestos dust.

31.

At all times Plaintiff was ignorant of the nature and extent of the life threatening risks and injury involved, and would not have continued to live and work in such an environment if he had known the true facts.

32.

Without knowledge of the nature and extent of the asbestos hazard, Plaintiff was denied the options of avoiding exposure, demanding protective devices, demanding safer operations, changing jobs, and protecting his home and family.

33.

MCC acted with knowledge and intention that workers at W.R. Grace & Co. were being harmed by the workplace and take-home exposures to asbestos and by the absence of warning and disclosure of the hazards of those exposures, such that MCC is liable to all who were injured by exposures to asbestos from the Grace operations and/or by the concealed nature of the hazard.

34.

MCC's acts and omissions were willful, reckless, and constituted actual malice. Although MCC knew that its acts and omissions created a high probability of harm to Plaintiff and to others that would be exposed to asbestos from W.R. Grace & Co.'s Libby work site, MCC nevertheless deliberately acted in conscious disregard for and indifference to this probability of harm such that it is appropriate to impose an assessment of punitive

or exemplary damages in a sufficient amount to punish MCC, deter similar conduct, and to serve as an example and warning to other legal entities similarly situated that conduct of the kind engaged in by MCC is unacceptable in our society.

35.

As a direct and proximate result of MCC's negligence in performance of industrial hygiene professional services for the protection of workers and others, including inadequate warnings, inspections and disclosure of known hazards, Plaintiff suffered from asbestos related cancer as a result thereof, and has incurred damages as alleged herein.

## SECOND CAUSE OF ACTION

### (Bad Faith Treatment of Workers with Rights to Occupational Disease Benefits, Breach of Fiduciary Duty, Deceit, Bad Faith, Negligent Misrepresentation and Constructive Fraud and Malice v. Maryland Casualty Company)

36.

Paragraphs 1-35 are incorporated by this reference.

37.

Beginning upon Grace's acquisition of the Mine in 1963 through at least June 30, 1973, MCC provided for the Mine workers, under Policies R-00590, R-00591, R-00592, et. seq., the disability insurance prescribed by Montana's Workers' Compensation and Occupational Disease laws.

38.

MCC owed duties with respect to workers' rights to occupational disease benefits, including the duties to adjust and pay occupational disease claims for benefits promptly and in good faith, and the duty not to hide or mislead workers about the facts of their exposure to asbestos, the course of latent asbestos disease process, or other facts relating to their entitlement to occupational disease benefits.

39.

Apart and distinct from any liability insurance for conduct of W.R. Grace & Co., during the period 1962-1973, MCC contracted to provide workers compensation/occupational disease coverage to employees under statutorily defined "compensation plan No. 2," which required that MCC "shall be directly and primarily liable to and will pay directly to the employee" the compensation owed under the Montana Occupational Disease Act (herein MODA).

40.

There was a special relationship between MCC and the workers that arose out of its contractual and statutory duty to be directly liable for occupational disease benefits. This special relationship arises from:

(a) inherently unequal positions of control and knowledge over disease-causing asbestos dust problem, and knowledge of the workers' "disease" and "injurious exposure" within the meaning of MODA;

(b) the workers' special vulnerability because of the harm they may suffer to their right to benefits for disability and/or medical expenses;

(c) the workers' need to place trust in MCC in its communication of asbestos disease hazards, injurious exposures to asbestos, and incidence and likelihood of asbestos-related disease, all known to MCC, especially because of the hidden, insidious, and latent nature of asbestos injury;

(d) MCC's awareness of this vulnerability, need and trust;

(e) the workers losing their right to pursue their employer for tort liability as a quid pro quo for the protection of benefits under MODA; and

(f) the workers being subject to time limitations for presenting claims for occupational disease benefits following injurious exposure.

41.

Because of the above-described special relationship, MCC had a fiduciary duty to disclose and not to suppress information necessary to the insured employees' rights as injured workers with injurious exposures and, therefore, their rights to occupational disease benefits for latent disease.

42.

This fiduciary duty is further defined and heightened by MCC's industrial hygiene control over the design of the safety program and the absence of reasonable warning therein, its conduct of workplace inspections, and by its control of information that should be communicated to the workers.

43.

This fiduciary duty is further defined and heightened by MCC's actual knowledge of a serious dust, health and occupational disease "claim" problem at the Libby facility, and the effect thereof on the workers' health and their health and disability benefit needs.

44.

MCC failed to disclose and suppressed the knowledge of the fact, degree and expected consequences of the asbestos hazard. Its safety program failed to provide for worker education and warnings, and it failed to report to the workers known and ongoing hazardous conditions. MCC concealed the expected course of latent disease process in workers. Further, MCC knew that workers were being advised that the dust was not dangerous, and that workers were not aware of the extreme asbestos dust concerns raised in reports of periodic inspections by the Montana State Board of Health.

45.

MCC knew that the workers would not be alerted to the occupational disease hazard of asbestos or the resulting occupational disease benefit entitlement because (a) the workers were not apprised of the presence of asbestos toxin in the apparently benign workplace dust; (b) the workers were not apprised that asbestos levels at the mine and mill far exceeded standards of danger for workplace exposure; and (c) asbestos hazard is hidden and insidious, has no irritant or odor signal of health hazard, has no immediate symptomological manifestation, and has a lengthy period of latency.

46.

MCC's non-disclosure and suppression of facts was done in order to hide from the workers the nature and degree of the hazard and the fact that workers had rights to occupational disease benefits for their injurious exposures under MODA which MCC would owe a direct duty to pay. With asbestosis experienced at a rate of 41.5% of workers with over 10 years of service, and lung disease at a rate of 92% of workers with 21-25 years of service, MCC faced enormous cost of medical and/or disability benefit claims.

47.

MCC's knowledge of, and motive with respect to, the impact of the suppressed facts on occupational disease claims included a November 25, 1967 letter to MCC from the attorney it retained to defend the MODA claim of Zonolite worker Lilas D. Welch.

48.

Suppressed and undisclosed facts included that "a great many of [MCC] insured's employees suffer from lung abnormalities;" the fact that asbestos fibers in "the dust in the mill did far exceed what were considered to be allowable concentrations;" and the fact that

not only the mill but "the entire yard area may subject workmen to what might be termed to be 'injurious exposure'" under MODA.

49.

The suppression and nondisclosure of facts was motivated by MCC's realization that it had "a severe problem, and that [it] might expect a good many claims involving asbestosis."

50.

Actions to conceal these facts include the suppression of radiologist studies where revelation of the studies "would reveal the extent and severity of the problem."

51.

MCC's knowledge of the hidden nature of the facts is reflected in the rationale of, and formed the basis of, a plan to keep Montana State Board of Health reports "out of the hands of the Industrial Accident Board," and "avoiding the necessity of exposure of all the more damaging aspects of our own situation."

52.

MCC sought to avoid disclosure to the Montana Industrial Accident Board, the entity charged with addressing compensability of occupational disease claims, the facts of the degree of disease-causing asbestos-laden dust in order to avoid MCC's liability on existing claims, the expected "good many claims involving asbestosis," as well as the future liability for benefits for workers with latent disease.

53.

MCC's conduct constituted a breach of its fiduciary duties as a workers compensation and occupational disease insurer of workers including Plaintiff.

54.

MCC's conduct constituted deceit within the meaning of § 27-1-712, MCA, and Plaintiff was misled thereby.

55.

MCC's conduct constituted bad faith and a breach of the duty of good faith and fair dealing.

56.

MCC's conduct constituted constructive fraud within the meaning of § 28-2-406, MCA, and negligent misrepresentation.

57.

MCC's conduct described in this count constituted malice.

58.

Plaintiff's permanent asbestos related disease, and resulting damages, was caused by Defendants' intentional and malicious acts and omissions.

59.

Defendants knew of facts and intentionally disregarded facts creating a high probability of injury to the Plaintiff; deliberately proceeded to act in conscious and intentional disregard of high probability of injury to Plaintiff; and deliberately proceeded to act with indifference to the high probability of injury to Plaintiff.

60.

As a direct and proximate result of Defendants' intentional and malicious acts or omissions, Plaintiff developed asbestos related lung cancer and suffered damages.

## JURY DEMAND

Plaintiff demands trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment for damages as follows:

1. Reasonable compensation for medical and related expenses;

2. Reasonable compensation for lost earnings and loss of earning capacity;

3. Reasonable compensation for mental and physical pain and suffering;

4. Reasonable compensation for Plaintiff's loss of enjoyment of life;

5. Reasonable compensation for Plaintiff's emotional distress;

6. Costs and disbursements incurred herein; and

7. Such other and further relief as to the court may seem just.

DATED this 23rd day of September, 2024.

KOVACICH SNIPES JOHNSON, P.C.


BY: /s/ Ross T. Johnson
    Ross T. Johnson
    P.O. Box 2325
    Great Falls, MT  59403
    Attorneys for Plaintiff